309 F.2d 208
 FAMILY RECORD PLAN, INCORPORATED (Dissolved) and Family Record Plan, Incorporated, Transferee of Family Record Plan, Incorporated (Dissolved), Petitioners,
v.
COMMISSIONER OF INTERNAL REVENUE, Respondent.
 No. 17563.
 United States Court of Appeals Ninth Circuit.
 October 22, 1962.
 Rehearing Denied November 29, 1962.
 
 Baird & Holley, Harold Easton, and Thomas A. Baird, Los Angeles, Cal., for petitioners.
 Louis F. Oberdorfer, Asst. Atty. Gen., Lee A. Jackson, David O. Walter, and Norman H. Wolfe, Attorneys, Department of Justice, Washington, D. C., and Crane C. Hauser, Chief Counsel, Internal Revenue Service, Washington, D. C., for respondent.
 Before HAMLEY, MERRILL and DUNIWAY, Circuit Judges.
 DUNIWAY, Circuit Judge.
 
 
 1
 In this petition to review decisions of the Tax Court, the problem presented is strikingly similar to that dealt with by us in Commissioner of Internal Revenue v. Kuckenberg, 309 F.2d 202, decided October 11, 1962.
 
 
 2
 Family Record Plan, Incorporated (dissolved), here referred to as Transferor, and Family Record Plan, Incorporated (formerly F.R.P., Inc.), here referred to as Transferee, are the petitioners. There is no substantial dispute as to the material facts.
 
 
 3
 The period in question is the tax year of Transferor, September 1, 1954 to February 28, 1955. It had for some years been in the business of selling to members of the public the right (represented by a certificate and embodied in a written contract) to have portrait photographs taken at stated intervals, free, by a studio in the customers' vicinity, and an album in which to mount the photographs so taken. A small down payment (usually $5.00 or $10.00) was made, and the balance was payable, usually at $5.00 per month, over a period, the length of which depended upon which of two types of contracts was used. The maximum contract period was nine months. Transferor carried no stock of albums; it ordered an album from the manufacturer, to be shipped direct to the customer, and this was done, as to each customer, when at least $10.00 had been paid, the cost of the album to Transferor being less than that amount. Transferor had written agreements with a large number of studios whereby the studio agreed to take the pictures and supply one copy to the customer, without cost for the first copy either to Transferor or to the customer. Each customer's contract designated a studio. Once the customer got the album, Transferor's sole remaining responsibility was to designate another studio if the named studio did not perform, or if the customer moved, or, if there were no available studio, to enlarge, retouch, print and return to the customer, a picture from a negative furnished by the customer. There is no showing that Transferor was called upon to perform any of these obligations in connection with any contract assigned, as hereafter described.
 
 
 4
 Transferee was organized for the purpose of buying the stock of Transferor, liquidating it, and continuing the business. The stockholders of Transferee had no connection with those of Transferor. On October 25, 1954, Transferee bought all of the stock, for $1,120,000. It allocated $800,000 of the price on its books to the cost of the accounts receivable then owned by Transferor, such accounts representing payments owing to Transferor from its customers. After October 25, Transferor was a wholly owned subsidiary of Transferee.
 
 
 5
 On December 10, 1954, the board of directors of Transferor adopted a plan of complete liquidation, and Transferee, as sole stockholder, consented. The plan required that Transferor cease business, which it did (except as hereafter indicated), and it duly filed the required information return with the Commissioner of Internal Revenue. The plan contemplated sale of "all or any part of the assets" of Transferor. Winding up was to be completed not later than November 30, 1955.
 
 
 6
 On December 17, 1954, Transferor sold its contracts with its customers, by written agreement, to one Smith and wife. The agreement covered all outstanding contracts, there being about 49,000 with an unpaid balance of $1,390,331.91, including about 9,000 delinquent accounts in the hands of collection agencies with an unpaid balance of $319,801.77. The Smiths did not undertake to perform the contracts; all that they got was the right to the collections. The sale was without recourse. The purchase price was $800,000, payable $200,000 down and the balance in installments, with the final payment due not later than September 1, 1955. The Smiths' obligation to pay was unconditional. Transferor was appointed agent of the Smiths to collect, the agency being irrevocable until the price was paid or until September 1, 1955, and all collections (net) were to be applied on the price. In fact, Transferor's collections resulted in full payment by April 19, 1955.
 
 
 7
 Meanwhile, by February 28, 1955, Transferor was fully wound up and dissolved, and all of its assets, including the contract with the Smiths, were assigned to Transferee. The transfer of the Smith contract was made as of December 30, 1954. Of the collections on the customer contracts, $225,000 was paid to Transferor, and $575,000 was paid, all after January 1, 1955, to Transferee. It is stipulated, however, that if any gain on the sale of the accounts "is recognized to transferor for federal income tax purposes, the amount of the gain to be included in income for the period September 1, 1954, to February 28, 1955, would be $800,000.00."
 
 
 8
 Both Transferor and Transferee were on the cash basis of accounting. In its final income tax return, Transferor did not include any part of the $800,000 in its income. The Commissioner included all of it, and the Tax Court affirmed the Commissioner. Transferee is in the proceeding solely as a transferee; its liability for tax on its own income is not here involved.
 
 
 9
 As in Kuckenberg, supra, the taxpayers' contention is that the sale of the contracts was a sale of "property" within the meaning of section 337 of the Internal Revenue Code (26 U.S.C. § 337) and that therefore no gain or loss to Transferor is recognized for income tax purposes. The Tax Court held that the sale was not a sale of "property," but a sale of "installment obligations" within the meaning of section 337(b). We do not pass upon this question, but expressly leave it undecided, because we think the decision correct for the reasons stated in Kuckenberg. We think that here, as there, the Commissioner was entitled, as he asserted before the Tax Court, in the exercise of his authority under section 446(b) (26 U.S.C. § 446(b)), to disregard Transferor's cash basis of accounting and to require computation by a method that would clearly reflect income. Essentially, what was "sold" was a right to receive income generated by Transferor in the regular course of its business, and nothing more, and receipt of $800,000 for that right was the receipt of income.
 
 
 10
 If the Tax Court was right in its conclusions, we should affirm, even if we think that it applied wrong legal reasons. (Boe v. Commissioner, 9 Cir., 1962, 307 F.2d 339). In this case, the Tax Court gave taxpayers ample opportunity to present additional evidence as to the application of section 446(b). None was offered. The question, as in Boe, is not what are the facts, but what are the legal rules applicable to the facts?
 
 
 11
 Petitioners also assert that the decision is contrary to the provisions of section 334(b) (2) of the Internal Revenue Code (26 U.S.C. § 334(b) (2)). There is nothing in the point. That section deals solely with the "basis," for capital gains purposes, of property received by Transferee, and not at all with the liability of Transferor for tax upon its own income, which is the sole question before us.
 
 
 12
 Affirmed.